Filed 9/13/22 In re D.J. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re D.J., a Person Coming Under the Juvenile Court Law. | C095312 |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>K.S. et al.,<br><br>Defendants and Appellants. | (Super. Ct. No. STK-JD-DP-2020-0000099) |

Appellants K.S. (mother) and D.J. (father), parents of the minor, appeal from the juvenile court's order terminating parental rights and freeing the minor for adoption.[1]

---

[1] Because father and the minor share the same initials, they will be referred to as "father" and "minor," respectively.

(Welf. & Inst. Code, §§ 366.26, 395.)[2]  The parents contend the juvenile court erred when it found neither the beneficial parental relationship exception nor the sibling relationship exception to adoption applied.  Finding no merit in the parents' claims, we will affirm the juvenile court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

*A. The 300 Petition and Initial Orders*

On May 16, 2020, the San Joaquin County Human Services Agency (Agency) filed a section 300 petition on behalf of the three-month-old minor and her 11-year-old half sibling, A.S., based on mother's substance abuse, the parents' history of domestic violence, and father's failure to provide for or protect the minor.[3]  The petition also alleged mother admitted having two prescription drug-related driving under the influence (DUI) cases in 2016, one of which occurred when mother passed out while driving and caused an accident.  The parents had previously come to the attention of child protective services in November 2019 because of their domestic violence and again in March 2020 after mother overmedicated herself with prescription drugs.  The minor was placed into protective custody.

The juvenile court ordered the minor detained and, over the course of the next several hearings, ordered supervised video visitation for both parents, followed by supervised in-person visits subject to COVID-19 restrictions.

Father visited the minor and A.S. weekly by video.  He initially exhibited concerning behavior during two visits, making inappropriate sexual statements to a third party, keeping his screen blacked out, and using profanity, all of which he denied.  It was also noted that father seemed preoccupied and not fully focused during visits with the

---

[2]  Undesignated statutory references are to the Welfare and Institutions Code.

[3]  A.S. is not a subject of the parents' appeal and will be mentioned only when relevant to the background and issues raised on appeal.

minor. Mother attended a residential substance abuse treatment program for several months in 2020 until she was discharged from the program for persistent behavioral problems. She was participating in parenting and domestic violence classes and completed an anger management program. She also visited with the minor and A.S. weekly by video.

The Agency recommended the court bypass father for services pursuant to section 361.5, subdivision (a) due to his lengthy criminal record, his continued downplaying of his criminal convictions despite their severity, and his continued denial of the substantiated allegations of domestic violence against mother. The Agency recommended, and the court ordered, reunification services for mother despite concerns that she had yet to demonstrate any significant behavioral change after five months of the services the Agency had already provided.

The court initially bypassed father for services at the disposition hearing pursuant to section 361.5, subdivision (a). However, at a subsequent contested hearing, based on testimony regarding father's participation in services and his unremarkable visits with the minor, the court ordered the Agency to provide father with reunification services, including a 52-week domestic violence program, parenting classes, and individual counseling as well as supervised visitation with the minor.

*B. Status Review Hearings*

In its March 2021 status review report, the Agency reported mother was participating in classes and counseling and she had completed the residential component of her substance abuse treatment program at New Directions and transferred to a homeless shelter, where she had extended overnight visits with the minor and A.S. with no concerns. However, mother was arrested in February 2021 for a traffic violation and DUI and taken into custody. Minor and A.S., who had been in the car at the time, were released to A.S.'s father, Mr. S. Mother was released the following day, but her

3

overnight visits with the minor were immediately suspended. The minor was safely returned to her foster caretaker, where she has since remained.

Father was reportedly participating in services, including domestic violence/anger management and parenting programs, and was learning how to control his temper and reduce stress and tension. There were no concerns with his video visits but his in-person visitation was challenging due to distance, poor weather conditions, and lack of transportation.

In April 2021, the Agency reported that mother had been terminated from a substance abuse treatment program after she tested positive for cocaine, despite her adamant denial of having used the drug. She was thereafter also terminated from drug court. The Agency recommended the court terminate mother's services, given she had already been given 11 months of services, nine of which she spent in residential substance abuse treatment with no success in learning to live substance free.

According to a supplemental report filed later that month, father had completed parenting classes, but concerns remained about the quality of time spent with the minor during his two in-person visits. During the first visit, father arrived over an hour late for the visit and, even then, only after several telephone calls from the social worker during which father stated he was at the store. During the second in-person visit, the minor sat on father's lap, looked around, and quietly played with some toys while father remained quiet and did not engage the minor. The Agency recommended the court terminate father's services due to the lack of time left to reunify.

At the contested dependent review hearing beginning on May 19, 2021, mother testified that she completed parenting classes and individual counseling. She was, however, continuing to use alcohol and drugs and admitted she tested positive for both in March 2021 and again in April 2021.

Social worker Laura Lyman testified that, prior to the February 2021 DUI arrest, mother was given liberal visitation with the minor, including unsupervised weekend

4

overnight visits. Following the DUI, mother's visitation was reduced and returned to supervised. Although mother's visits were positive, Lyman recommended termination of services because mother was still in a substance abuse treatment program, she tested positive in April 2021 and again in May 2021, she was terminated from the program, and there were concerns about mother's prescription drug use.

Lyman testified father had supervised visits with the minor twice a week, once in person and once via video. Father completed his parenting classes, was enrolled in individual counseling, and was attending domestic violence classes. Lyman was concerned, however, that father continued to minimize the seriousness of the allegations in the petition. Lyman recommended father's services be terminated, in part due to the quality of his in-person visits, and in part due to the difficulty of such visits because of the various obstacles father faced (i.e., weather conditions, illness, and lack of transportation). Lyman's recommendation was influenced by the April 7, 2021 visit when father arrived in town but spent a good portion of the designated visitation time at a Walmart store and spent only 30 of the allotted 90 minutes with the minor. She also noted father's in-person visits were "sporadic" and, when she attempted to schedule in-person visits in February 2021, father asked for video visits instead. Lyman testified that, in the previous months, father had again requested video visits instead of in-person visits. She had offered father several different transportation options, including train tickets and offering to drive him from the nearest train station. Lyman's recommendation was also influenced by reports that, at times, father was inattentive to the minor even during video visits. As a result of these observations and reports, Lyman was unsure how bonded the minor was to father.

Father testified he was participating in individual counseling and a domestic violence program and had completed his parenting classes. He lived in Oakland and had to travel to Stockton for visits with the minor. He sold his car in February 2021 due to financial problems and asked for transportation assistance from Lyman, who provided

5

him with Amtrak tickets, which he claimed he used to visit the minor. Father testified he took the train to Stockton for the April 7, 2021 in-person visit. He claimed he went to the Agency's building but left due to an upset stomach. He then went to a store across the street to look for medicine but then got a Lyft to Walmart to use the restroom, making him late for the visit. On cross-examination, father changed his testimony and said he got a ride to Stockton on April 7, 2021. When asked why he was able to make it to court hearings but not in-person visits, father testified his friend gave him rides or he borrowed another friend's car.

The court found that although father always found a way to get to court, he failed to use the Amtrak tickets to visit the minor. Adopting the Agency's recommended findings and orders, the court terminated reunification services for both parents and set a section 366.26 hearing.

According to the status review reports filed in August 2021, the parents were still receiving weekly supervised in-person and video visits with the minor. Mother's visits with the minor ceased, however, when she entered a substance abuse treatment program at some point in the summer of 2021. Visits between the minor and A.S. were reportedly stopped in August 2021 because the minor was exhibiting inappropriate sexual behavior.

In September 2021, the juvenile court dismissed dependency as to the minor's sibling, A.S., who was in the care of her father, Mr. S.

*C. The 366.26 Hearing*

The Agency recommended the court terminate parental rights as to the minor and free her for adoption. The minor's caretakers, with whom she had lived since the time of her removal in May 2020, were resource family approved and wished to adopt the minor.

By the time the section 366.26 hearing commenced on December 3, 2021, the minor was two years old. Mother testified about her visitation with the minor, stating she read and sang to the minor, played games with her, and fed and groomed her. Mother testified the minor called her "Mommy" and would smile and laugh during visits. At the

6

end of the visits, she would put the minor in her car seat, blow her a kiss, and tell her she loved her. The minor would blow mother a kiss back. When asked whether the minor seemed upset when they parted, mother said, "Sometimes she did." Mother testified the overnight visits stopped because she went to her brother's house and "had a wine cooler."

Mother further testified, presumably based on the two months she spent with the children before her February 2021 arrest for DUI, that the minor and A.S. enjoyed visits together. During those visits, the children would eat, play, and sing together and A.S. would read to the minor. Visits between the minor and A.S. ceased after an allegation of inappropriate touching was made regarding the minor. Once A.S.'s dependency case was dismissed, visits between the siblings stopped and, according to mother, the minor's "spirit is now broken." Mother believed it would be harmful to the minor to cut off her relationship with A.S. because the minor "knows who she is."

Social worker Shahid Khan testified he arranged weekly in-person and video visits between mother and the minor. He also transported mother to the visits. At the start of a visit, the minor smiled at mother and called her "Mom." Mother and the minor showed affection toward one another. The minor was not upset or crying and did not exhibit any type of anxiety after visits and when mother's visits were temporarily stopped after she was arrested for DUI, the minor's behaviors did not change.

Khan testified he arranged weekly in-person and video visits between father and the minor. He transported father to and from visits. He testified the minor was a little bit anxious at the start of the visits and would not immediately approach father. When father approached the car, the minor would not go immediately to him. Instead, she would go to Khan and sit in his lap. After about five minutes, the minor would be fine and father would feed her, carry her, and play with her. Father hugged the minor and she would sometimes hug him back. Khan did not recall ever hearing the minor refer to father as "Dad," and he testified the minor had no difficulty parting with father at the end of the visits.

7

Regarding the minor and A.S., Khan testified the two siblings had visits at Mr. S.'s residence, which continued even after mother entered substance abuse treatment, but stopped following a complaint from the caregiver that the minor exhibited inappropriate sexual behavior. Khan did not receive any reports that the minor was decompensating or expressing anxiety due to the cancel.lation of sibling visits, nor was she exhibiting any anxiety or sadness after visits with the parents.

Father testified he had in-person and video visits with the minor, during which he played and talked with the minor. He testified the minor called him "Dada" and "Dad" and was never fussy during visits. She wanted to keep playing even when the visit was over. Father said his bond with the minor was evidenced by the fact that the minor always gave him her attention and let him know she knew who he was. Father admitted he canceled some in-person visits and requested video visits because of his schedule and transportation issues. He confirmed he had no in-person visits during the month prior to the hearing.

The court found the parents failed to meet their burden to establish that adoption would be detrimental to the minor and, therefore, neither the beneficial parental relationship exception nor the sibling relationship exception to adoption applied. The court terminated parental rights, freeing the minor for adoption.

## DISCUSSION

### I

### *Beneficial Parental Relationship Exception*

The parents claim the juvenile court erred when it found the beneficial parental relationship exception to adoption did not apply. They argue the court failed to conduct the analysis required by *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*) and considered improper factors in making its determination. The claims lack merit.

At the section 366.26 selection and implementation hearing, a juvenile court must choose one of the several " 'possible alternative permanent plans for a minor child. . . .

8

*The permanent plan preferred by the Legislature is adoption.* [Citation.]' [Citation.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.) There are only limited circumstances that permit the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) One such circumstance is the so-called beneficial parental relationship exception. (§ 366.26, subd. (c)(1)(B)(i) [beneficial parental relationship exception]; *Caden C., supra*, 11 Cal.5th at p. 629.)

The party claiming the exception has the burden of establishing the existence of any circumstances that constitute an exception to termination of parental rights. (*Caden C., supra*, 11 Cal.5th at pp. 636-637; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252; Cal. Rules of Court, rule 5.725(d)(2).) For the beneficial parental relationship exception to apply, the parent "must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C.*, at p. 636.)

The beneficial parental relationship exception to adoption "must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) The factual predicates of the exception must be supported by substantial evidence, but the juvenile court exercises its discretion in weighing that evidence and determining detriment. (*Caden C., supra*,

9

11 Cal.5th at pp. 639-640.) We do not substitute our judgment for that of the juvenile court as to what is in the child's best interests. (*Id.* at pp. 640-641.)

Regarding the first element of the exception, it is undisputed that, when not in custody or substance abuse treatment, mother maintained regular visitation by video and in person, eventually graduating to extended, unsupervised overnight visits with the minor until her visits were suspended as a result of her DUI arrest in February 2021. Father's visits, on the other hand, were less regular and consistent. He seldom visited in person, preferring to visit by video due to his personal schedule, weather conditions, or transportation issues. Despite the Agency's offer to transport him to and from visits and provide him with train tickets as another option, father opted for video visits instead and only used the train tickets once for a visit, arriving in town on time but showing up an hour late for the visit. By his own testimony, father was able to appear in person for court hearings because he was either dropped off by a friend or had access to a car but, for reasons he could not explain, he was not able to do the same for in-person visits.

Regarding the second element—that the child has a substantial, positive, emotional attachment to the parent such that the child would benefit from continuing the relationship—the record shows the parents loved the minor. However, that fact alone is insufficient to establish the bond necessary to fend off termination of parental rights. The minor was just three months old when she was removed from mother's custody. Father had spent only half of that time with the minor before mother and the child moved out. After removal, the minor spent the next two years with her foster caregivers while the parents' contact with the minor was limited to visits. During those visits, mother groomed, fed, played with, and read and sang to the minor, who sometimes called mother "mama" or "mommy." Although the minor enjoyed her visits with mother and wanted to be held by mother, the social worker reported the minor was never upset or anxious when leaving mother after a visit and did not exhibit any behavioral changes in mother's

10

absence. In the words of the social worker, mother's relationship with the minor was that of a "loving, caring relative."

Father's visits were primarily by video. He was distracted during the earlier visits and engaged in inappropriate conversations. In later visits, he was observed to be preoccupied and not fully focused. He arrived nearly an hour late for one in-person visit and was inattentive to the minor during another. The social worker observed that the minor was a bit anxious at the start of each visit with father and took several minutes to warm up to him. While father testified the minor called him "Dada" and "Dad," the social worker could not recall ever hearing the minor refer to father in that manner. And, like visits with mother, the minor had no difficulty parting with father when visits ended.

Father testified his bond with the minor was evidenced by the fact that the minor gave him her attention and knew who he was. Mother testified her parental rights should not be terminated because she was "an active mother of three" who showed up to all of the hearings and wanted "to be with [her] baby." In the end, the parents demonstrated a loving relationship with the minor but provided scant evidence of the substantial bond necessary for the beneficial parental relationship exception to apply.

Finally, with regard to the third element of the exception, the parents provided little evidence that termination of the bond between the parents and the minor "would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 636.) As previously discussed, the minor was removed from the parents at approximately three months of age. Thereafter, the minor lived with and was cared for by her foster caretakers, where she was by all accounts thriving. The minor enjoyed her visits with mother and father and generally reciprocated their affection, but she had no trouble separating from them and returning to her caregivers, with whom she was also loving and affectionate. She was similarly unaffected by mother's absence during periods of custody or substance abuse treatment.

11

In short, there was a dearth of evidence from either parent to demonstrate the minor would suffer detriment if parental rights were terminated.

The parents argue the court failed to conduct a proper analysis as required by *Caden C., supra*, 11 Cal.5th 614, and may have considered an improper factor—the nature and extent of father's parental relationship with the minor—in analyzing the applicability of the beneficial parental relationship exception. We disagree on both counts. As father properly concedes, the court "may make *explicit or implicit findings* ranging from specific benefits related to the child's specific characteristics up to a higher-level conclusion about the benefit of adoption all told." (*Caden C.*, at p. 640, italics added.) Here, the court heard the testimony of both parents and the social workers regarding the three elements set forth in *Caden C.*, followed by argument from counsel regarding whether the evidence presented established the three elements and whether or not the beneficial parental relationship exception applied. Having considered both the evidence and oral argument, and noting the parents had the burden to show the exception applied, the court found there was insufficient evidence of detriment to the minor and thus the exception did not apply. In so finding, the court implicitly found adoption was in the minor's best interest and otherwise made no mention of any improper fact or evidence factoring into its determination.

We conclude the juvenile court did not err in finding the beneficial parental relationship exception to adoption did not apply.

II

*Sibling Relationship Exception*

Father contends the juvenile court's failure to apply the sibling relationship exception to adoption was error. We disagree.

As previously noted, there are only limited circumstances that permit the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) One such circumstance is when

12

termination of parental rights would result in "substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).)

There is a "heavy burden" on the party opposing adoption under the sibling exception. (*In re Daniel H.* (2002) 99 Cal.App.4th 804, 813.) "To show a substantial interference with a sibling relationship the parent must show the existence of a significant sibling relationship, the severance of which would be detrimental to the child." (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 952.) If the court determines that the child has a significant sibling relationship and would suffer detriment if that relationship were severed, the court then must weigh the benefit to the child of continuing the relationship against "the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v); see *In re L. Y. L.*, at pp. 952-953.) As with the beneficial parental relationship exception to adoption, we do not substitute our judgment for that of the juvenile court as to what is in the child's best interest. (*Caden C., supra*, 11 Cal.5th at p. 641.)

While by all accounts the minor and A.S. enjoyed each other's company, the parents presented no evidence that the siblings' relationship was so significant that severance would have been detrimental to the minor. The minor spent just three of the first months of her life living with A.S. At the time of their initial removal, the minor and A.S. were placed with different caregivers. Thereafter, the siblings' interaction consisted of shared video visits once a week, followed by approximately two months of in-person and extended overnight visits with mother until mother was arrested for DUI, and finally weekly in-person visits with Mr. S. Although the Agency had reported in the status

13

review reports filed in August 2021, that the minor and A.S. were "well-bonded and have a good relationship with each other," visits had to be suspended after the caregiver reported the minor was inappropriately touching herself and another child. As of the time of the section 366.26 hearing, visits between the siblings had not resumed. And, contrary to mother's assertion that the minor's spirit was broken, the social worker testified the cancellation of visits between the minor and A.S. did not cause the minor to exhibit any anxiety or negative behaviors.

Neither parent provided substantial evidence that it would be harmful to the minor to sever her relationship with A.S. Mother testified only that she believed it would be harmful because the minor "knows who [A.S.] is." Father made no mention of a sibling bond at all.

The parents bore the burden of demonstrating the sibling relationship exception to adoption applied and failed to make the requisite showing. (*In re Daniel H., supra*, 99 Cal.App.4th at p. 813.) Considering all of the evidence, we conclude the juvenile court properly found the sibling relationship exception did not apply. Therefore, there was substantial evidence to support the court's order terminating parental rights and freeing the minor for adoption.

## DISPOSITION

The juvenile court's judgment is affirmed.

/s/
EARL, J.

We concur:

/s/
HULL, Acting P. J.

/s/
RENNER, J.

14